JOHN A. YANCHUNIS (*pro hac vice*)
jyanchunis@forthepeople.com
RYAN J. McGEE (*pro hac vice*)
rmcgee@forthepeople.com
JONATHAN B. COHEN (*pro hac vice*)
jcohen@forthepeople.com
**MORGAN & MORGAN**
**COMPLEX LITIGATION GROUP**
201 N. Franklin Street, 7th Floor
Tampa, FL 33602
Telephone:     (813) 223-5505
Facsimile:     (813) 223-5402

*Counsel for Plaintiffs Matt Matic and Zak Harris*

IVY T. NGO, SBN 249860
ngoi@fdazar.com
**FRANKLIN D. AZAR & ASSOCIATES, P.C.**
14426 East Evans Avenue
Aurora, Colorado 80014
Telephone:     (303) 757-3300
Facsimile:     (720) 213-5131

*Counsel for Plaintiffs Charles Olson and Eileen M. Pinkowski*

CLAYEO C. ARNOLD, SBN 65070
carnold@justice4you.com
JOSHUA H. WATSON, SBN 238058
jwatson@justice4you.com
**CLAYEO C. ARNOLD**
**A PROFESSIONAL LAW**
**CORPORATION**
865 Howe Avenue
Sacramento, California 95825
Telephone:     (916) 777-7777
Facsimile:     (916) 924-189

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| IN RE GOOGLE PLUS PROFILE LITIGATION | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

No. 5:18-CV-06164-EJD (VKD)

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT**

Date:          February 20, 2020
Time:          9:00 a.m.
Courtroom:     4, 5th Floor
Judge:         Hon. Edward J. Davila

# <u>TABLE OF CONTENTS</u>

I.       INTRODUCTION ...............................................................................................1

II.      ALLEGATIONS OF THE COMPLAINT.......................................................2

         A.      Google's Social Media Platform and Representations Concerning Data
                 Security .................................................................................................2

         B.      The First Data Leak .............................................................................3

         C.      The Second Data Leak .........................................................................4

         D.      Litigation History.................................................................................4

         E.      Plaintiffs' Claims and Relief Sought ...................................................5

         F.      Settlement Negotiations .......................................................................6

III.     THE SETTLEMENT TERMS...........................................................................6

IV.      ARGUMENT......................................................................................................9

         A.      The Settlement Class Should Be Preliminarily Certified ....................9

                 1.      The Rule 23(a) Requirements Are Met......................................9

                 2.      The Requirements of Rule 23(b) Are Met ...............................10

         B.      The Settlement Should be Preliminarily Approved ............................11

                 1.      The Strength of Plaintiffs' Case...............................................13

                 2.      The Risk, Expense, Complexity, and Likely Duration of Further
                         Litigation...............................................................................15

                 3.      The Risk of Maintaining Class Action Status Through Trial ...16

                 4.      The Amount Offered in Settlement..........................................16

                 5.      The Extent of Discovery Completed and the Stage of Proceedings ..........17

                 6.      The Experience and View of Counsel ......................................17

                 7.      The Presence of a Government Participant................................18

                 8.      The Reaction of the Class Members to the Proposed Settlement ..............18

                 9.      Lack of Collusion Among the Parties.......................................19

         C.      The Proposed Notice Plan Should Be Approved.................................19

         D.      Appointment of the Settlement Administrator....................................20

E.   Appointment of Settlement Class Counsel ..............................................20

F.   Appointment of Special Master to Designate Cy Pres Recipients........................21

G.   Schedule for Final Approval ........................................................21

**TABLE OF AUTHORITIES**

**CASES**                                                                                                    **PAGE(S)**

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) ............................................................9, 11

*Cotter v. Lyft, Inc.*, 193 F. Supp. 3d 1030 (N.D. Cal. 2016) ..............................................12

*Ellis v. Costco Wholesale Corp.*, 657 F.3d 970 (9th Cir. 2011) ...........................................9

*G. F. v. Contra Costa Cty.*, No. 13-cv-03667-MEJ,
    2015 WL 4606078 (N.D. Cal. July 30, 2015) ...............................................................19

*Hammond v. The Bank of N.Y. Mellon Corp.*, No. 08 Civ. 6060 (RMB) (RLE),
    2010 WL 2643307 (S.D.N.Y. June 25, 2010) ..............................................................15

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998) ..............................................10

*In re Anthem, Inc. Data Breach Litig.*, 327 F.R.D. 299 (N.D. Cal. 2018)....................................11

*In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935 (9th Cir. 2011)...............................13

*In re High-Tech Emp. Antitrust Litig.*, No. 11-CV-02509-LHK,
    2014 WL 3917126 (N.D. Cal. Aug. 8, 2014) ...............................................................11

*In re LinkedIn User Privacy Litig.*, 309 F.R.D. 573 (N.D. Cal. 2015) ..........................................11

*In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078 (N.D. Cal. 2007)....................................11

*In re U.S. Office of Pers. Mgmt. Data Sec. Breach Litig.*,
    266 F. Supp. 3d 1 (D.D.C. 2017) ....................................................................15

*In re Yahoo! Inc. Cust. Data Sec. Breach Litig.*,
    No. 5:16-md-02752-LHK (N.D. Cal. July 20, 2019)........................................................11, 18

*Just Film, Inc. v. Buono*, 847 F.3d 1108 (9th Cir. 2017) ....................................................10, 11

*Linney v. Cellular Alaska P'ship*, 151 F.3d 1234 (9th Cir. 1998) ..............................................15

*Matic, et al v. Google, Inc.*, No. 5:18-cv-06164-EJD (N.D. Cal. 2018)....................................4, 5

*O'Connor v. Uber Techs., Inc.*, 201 F. Supp. 3d 1110 (N.D. Cal. 2016) ....................................12

*Olson, et al v. Google, Inc.*, No. 5:18-cv-06365-NC (N.D. Cal. 2018) ....................................4, 5

*Parsons v. Kimpton Hotel & Rest. Group, LLC*,
    No. 3:16-cv-05387-VC (N.D. Cal. Jan. 9, 2019) .........................................................11

*Smith v. Triad of Ala., LLC*, No. 1:14-CV-324-WKW,
 2017 WL 1044692 (M.D. Ala. Mar. 17, 2017)........................................................16

*Spann v. J.C. Penney Corp.*, 314 F.R.D. 312 (C.D. Cal. 2016)................................19

*Staton v. Boeing Co.*, 327 F.3d 938 (9th Cir. 2003) ...............................................10

*Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036 (2016) ....................................11

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) ...........................................10

**STATUTES, RULES, AND REGULATIONS**                                              **PAGE(S)**

Class Action Fairnes Act, 28 U.S.C. § 1715, *et seq*. ...............................................18

Fed. R. Civ. P. 23 ............................................................................................ *passim*

**PUBLICATIONS**                                                                    **PAGE(S)**

Manual for Complex Litigation (4th Edition)..............................................................9

## I.    INTRODUCTION

In October and December 2018, Google[1] acknowledged that software bugs in its Google+ social media platform potentially exposed Google+ users' profile information to unauthorized third parties (collectively, the "Data Disclosures"), including the users' names, genders, and email addresses, as well as additional profile fields, such as the users' occupations and places lived. ("Personal Information").

Following the filing of class action complaints, Co-Lead Counsel retained experts in the areas of cybersecurity, dark web valuations, and financial modeling; consolidated the plaintiffs and causes of action for the purposes of the operative Amended Consolidated Class Action Complaint (the "Complaint") (Dkt. No. 37); fully briefed dispositive motions and responses thereto; exchanged informal discovery; and engaged in a day-long mediation session. At the arm's-length mediation conducted by renowned mediator Randall C. Wulff, the parties reached a resolution that—if accepted—will resolve all pending litigation and provide substantive relief to Class Members.

On April 2, 2019, Google took its Google+ social media platform offline for consumer use, thus alleviating any further need for revised information and data security business practices.

The Settlement provides a $7,500,000 non-reversionary settlement fund for the benefit of the Class ("Settlement Fund"). The Settlement Fund will be used for disbursements to claimants, as well as for administrative costs, service awards, and any fees, costs, and expenses sought by Class Counsel ("Net Settlement Fund"). The Net Settlement Fund shall be allocated to Claimants on a pro rata basis up to an initial cash payment of US$5.00 per Claimant. If there are insufficient funds to pay claimants $5.00 based on the number of claimants, the payment to each claimant will be reduced pro ratably. If sufficient funds remain after calculation of the aggregate initial maximum distribution of US$5.00 per Claimant, the allocation shall be recalculated on a pro rata basis up to a maximum distribution of up to US$12.00 per Claimant. Under no circumstances will any Class Member receive more than $12.00. Any funds remaining in the Net Settlement Fund

---

[1] Unless otherwise noted, all capitalized terms are defined in the Settlement Agreement and Release, which is being filed concurrently herewith as **Exhibit 1**.

after distribution(s) to Class Members will be distributed to Cy Pres Recipients that have been selected by a neutral third party and approved by the Court.

Plaintiffs strongly believe the Settlement is favorable for the Settlement Class.[2] The Settlement provides quick relief for Settlement Class Members, including payments for potentially disseminating their non-public information to unauthorized third-party application developers. Importantly, the Personal Information of all Class Members was never disseminated or accessed by hackers or other malicious third parties, but instead was potentially exposed to third-party software developers known to Google.

Accordingly, Plaintiffs respectfully request the Court preliminarily approve the parties' Settlement Agreement and enter an order that:

(1) Certifies the Settlement Class under Fed. R. Civ. P. 23(b)(3);

(2) Preliminarily approves the Settlement as fair, reasonable, and adequate;

(3) Directs Notice to be disseminated to the Settlement Class in the form and manner proposed by the parties as set forth in the Settlement Agreement and Exhibits A and B thereto;

(4) Appoints Angeion Group ("Angeion") to serve as the Settlement Administrator;

(5) Appoints Class Representatives and Class Counsel; and

(6) Sets a hearing date and schedule for final approval of the settlement and consideration of Class Counsel's motion for award of fees, costs, expenses, and service awards.

## II. ALLEGATIONS OF THE COMPLAINT

### A. Google's Social Media Platform and Representations Concerning Data Security

Google provides comprehensive internet services. Launched in June 2011, Google's social media platform, Google+, facilitated the sharing of information, photographs, weblinks, conversations, and other shared, private content similar in many ways to Facebook, Twitter, and other social media platforms. ¶ 2.[3] As part of the sign-up process and a consequence of interacting

---

[2] Declaration of John Yanchunis ("Yanchunis Dec."), ¶ 33.
[3] References to "¶__" or "¶¶__" are to the Complaint, unless otherwise noted.

with the social media platform, Google+ users created, maintained, and updated profiles containing significant amounts of Personal Information, including the users' names, genders, and email addresses, as well as additional profile fields, such as the users' occupations and places lived. ¶ 3.

Anyone creating a Google+ account and participating in the Google+ social media platform agreed to Google's Terms of Service, which made it clear Google collected and stored this information for its users. ¶ 20. The Google Privacy Policy, however, made specific representations to users regarding the *protection* and *exposure* of their Personal Information. ¶ 20. The Google Privacy Policy specifically advised users that "When you use [Google's] services, you're trusting us with your information. We understand this is a big responsibility and work hard to protect your information and put you in control." ¶ 21.[4] Google explicitly represented that it would only "share [P]ersonal [I]nformation outside of Google when we have your consent. ¶ 21.[5] Google's Privacy Policy continued, representing that users "have choices regarding the information [Google] collect[s] and how it's used," that Google needed to "ask for [users'] consent before using [that] information for a purpose that isn't covered in [the Google Privacy Policy]," and that Google would "ask for [users'] explicit consent to share any sensitive personal information." ¶ 22.[6] Most importantly, Google stated users "[c]ontrol whom you share information with through your account on Google+." ¶ 23.[7]

### B. The First Data Leak

On October 8, 2018, Google suddenly announced it would permanently shutter its Google+ social media platform, but within that announcement, Google disclosed that a "software glitch" had allowed third-party application developers access to Google+ users' Personal Information between 2015 and March 2018 (the "First Data Leak"). ¶ 27. In announcing the First Data Leak, Google explained that while users could grant third party applications access to their Personal Information, a "glitch" or "bug" in Google's Application Program Interfaces ("API") allowed

---

[4] Google, Privacy Policy (May 25, 2018), https://policies.google.com/privacy
[5] *Id.*
[6] *Id.*
[7] *Id.*

third-party applications to access that Personal Information without the Google+ users' permission. ¶ 28.[8] In other words, the First Data Leak made it possible for third parties to access users' Personal Information without permission. The information substantiating the First Data Leak was, however, known to Google since March 2018, yet Google took approximately seven months to disclose it to the public. ¶ 32. The First Data Leak affected an unknown number of users, with potentially 438 third-party developers accessing that Personal Information. ¶ 33.

### C.    The Second Data Leak

On December 10, 2018, Google announced that it would accelerate the closing of Google+ from August 2019, to April 2019, due to another "glitch" or "bug" that permitted the Personal Information of several million users in the United States to be shared with third-party developers (the "Second Data Leak"). ¶ 50. The Second Data Leak resulted from Google attempting to fix another vulnerability identified in the Google+ platform, but instead resulted in exposure of the Personal Information to unauthorized third-party developers between November 7, 2018 and November 13, 2018, regardless of the privacy setting the Google+ user set for her or his profile. ¶¶ 50–51.

### D.    Litigation History

Following Google's announcement of the First Data Leak, Plaintiffs Matt Matic and Zak Harris filed their class action complaint on October 9, 2018 (the "*Matic* Case"). (Dkt. No. 6). Shortly thereafter, Plaintiffs Charles Olson and Eileen Pinkowski filed their class action complaint on October 17, 2018 (the "*Olson* Case"). (Dkt. No. 12). And on December 5, 2018, this Court ordered the *Matic* Case and *Olson* Case related, pursuant to Civil L.R. 3-12. (Dkt. No. 20). On December 11, 2018, following Google's announcement of the Second Data Leak, but before the *Matic* Case and *Olson* Case were consolidated, Plaintiffs Matic and Harris filed their First

---

[8] Douglas MacMillan & Robert McMillan, *Google Exposed User Data, Feared Repercussions of Disclosing to Public*, The Wall Street Journal (Oct. 8, 2018), available at https://www.wsj.com/articles/google-exposed-user-data-feared-repercussions-ofdisclosing-to-public-1539017194; Douglas MacMillan & John McKinnon, *Google to Accelerate Closure of Google+ Social Network After Finding New Software Bug*, The Wall Street Journal (Dec. 10, 2018), available at https://www.wsj.com/articles/google-to-accelerate-closure-of-google-social-network-1544465975.

Amended Class Action Complaint, consolidating the First and Second Data Leaks into this litigation. (Dkt. No. 26). Shortly thereafter, counsel in both the *Matic* Case and *Olson* Case jointly moved for appointment of Interim Lead Counsel, (Dkt. No. 27), and counsel for all parties (i.e., *Matic*, *Olson*, and Google) jointly petitioned the Court to consolidate the cases. (Dkt. No. 30). On January 9, 2019, the Court consolidated the *Matic* Case and *Olson* Case, (Dkt. No. 31), counsel in the *Matic* Case and *Olson* Case convened and filed their consolidated complaint (i.e., the previously-defined Complaint), (Dkt. No. 37), and the Court appointed John A. Yanchunis and Ivy T. Ngo as co-lead counsel. (Dkt. No. 44).

On April 10, 2019, Google moved to dismiss Plaintiffs' Complaint, arguing failure to allege economic or other harms, and failure to allege sufficient factual bases to meet Fed. R. Civ. P. 8, 9, and 12 pleadings standards. (Dkt. No. 45). On May 10, 2019, Plaintiffs responded in opposition to Google's Motion to Dismiss, detailing the sufficiency of their factual and legal allegations in support of equitable and other relief, (Dkt. No. 47), and on May 31, 2019, Google filed its reply to Plaintiffs' opposition. (Dkt. No. 49).

### E.    Plaintiffs' Claims and Relief Sought

Plaintiffs sought several types of equitable and monetary relief in this matter, premised on claims arising from the Data Disclosures. Fundamentally, Plaintiffs' theories rested on three crucial issues: Google 1) failed to prevent the unauthorized disclosure of Google+ consumers' Personal Information; 2) waited approximately seven months after discovering and remediating the First Data Leak and reporting the First Data Leak to consumers; and 3) caused the Second Data Leak attempting to remediate additionally-identified vulnerabilities. ¶ 50.

Accordingly, Plaintiffs sought relief under numerous legal theories, including: violation of California's Unfair Competition Law ("UCL"), for unlawful, unfair, and fraudulent/deceptive business practices; negligence; invasion of privacy; breach of confidence; deceit by concealment or omission; breach of contract; and breach of the implied covenant of good faith and fair dealing. ¶¶ 125–221.

### F.     Settlement Negotiations

Following full briefing of Google's Motion to Dismiss, Google's counsel and Co-Lead Counsel discussed the possibility of a mediation in this case, and on August 14, 2019, Interim Class Counsel and Google engaged in an arm's-length, in-person, day-long mediation session under the direction of Mr. Randall Wulff in California. (Dkt. No. 52). During the mediation, the parties agreed to terms forming the substance of the Settlement. Negotiations of attorneys' fees, costs, and expenses did not commence until agreement on behalf of the Settlement Class had been reached. S.A. §§ 9.1, 10; Yanchunis Dec., ¶¶ 4, 15, 16.

## III.    THE SETTLEMENT TERMS

### A.     Proposed Settlement Class

The Settlement Agreement will provide relief for the following class:

> All persons residing in the United States who: (1) had a consumer Google+ account for any period of time between January 1, 2015, and April 2, 2019; and (2) had their non-public Profile Information exposed as a result of the software bugs Google announced on October 8, 2018, and December 10, 2018.

S.A., § 1.8.

Because the claims at issue relate to alleged disclosure of private information, the class is defined to include U.S. users who included non-public information in their Google+ profile fields that was exposed due to the bugs. Users meeting the class definition will have the opportunity to submit a claim form affirming that they had non-public information in their Google+ profile fields that was susceptible to the software bugs, either because the user shared the profile information with another Google+ user, or authorized a third-party app to access that information.

While the parties do not know the total number of users who meet the class definition, based on available data about the U.S-based accounts that were potentially susceptible to the second bug, it is estimated that under ten million users in the United States had account settings such that information in their profiles could have been exposed by the second bug.  As to the first bug, due to the lack of historical records, the total number of potentially affected accounts during the  first bug's existence cannot be conclusively determined.  However, the relatively small number of susceptible accounts at the time of its discovery suggests that the impact of the first bug

was significantly smaller than the second bug. Further, the parties do not have sufficient information to determine how many of those users with susceptible accounts had non-public data in profile fields, and thus do not know the exact number of persons contained within the proposed class.

**B.     Business Practice Changes**

Following the announcement of the first software bug on October 8, 2018, Google announced its intent to permanently shutter its Google+ social media platform in August 2019. ¶¶ 1, 27, 44. Following the announcement of the second software bug on December 10, 2018, Google expedited the shuttering of its Google+ social media platform to April 2, 2019. ¶ 52. Because the Google+ social media platform is no longer operative for consumer use, Plaintiffs do not seek any additional business practice changes because the potential for harm has been remediated. Yanchunis Dec., ¶ 24.

**C.     Settlement Fund**

Google's total financial commitment under the Settlement Agreement is $7,500,000. S.A. §§ 1.48, 2.1. The Settlement Fund will be applied to pay all Notice and Administrative Costs, the taxes described within the Settlement Fund, the Fee, Cost, and Expense Award, and any Service Awards. S.A. § 2.8. The Settlement Fund will also be used to distribute Residual Settlement Payments (if any) to Approved Cy Pres Recipients. S.A. §§ 2.8, 2.12. The Net Settlement Fund will be applied to Claimants in accordance with the Final Approval Order or any subsequent order of the Court. S.A. §§ 2.8, 2.9. The Net Settlement Fund will be allocated to Claimants on a pro rata basis up to a cash payment of US$5.00 per Claimant. S.A. §§ 2.8, 2.10. If there are insufficient funds to pay claimants $5.00 based on the number of claimants, the payment to each claimant will be reduced pro ratably. S.A. §§ 2.8, 2.10. If sufficient funds remain after calculation of the aggregate initial maximum distribution of US$5.00 per Claimant, the allocation shall be recalculated on a pro rata basis up to a maximum distribution of up to US$12.00 per Claimant. S.A. § 2.10. Under no circumstances will any Class Member receive more than $12.00. S.A. § 2.10. Any funds remaining in the Net Settlement Fund after distribution(s) to Class Members will be distributed to Cy Pres Recipients that have been selected by a neutral third party and approved

by the Court. S.A. §§ 2.8, 2.9. Plaintiffs believe the Settlement Fund will be more than ample enough to accommodate the amounts drawn from it, Yanchunis Dec., ¶¶ 22, 30–32, but, in the event it is not, all claims drawn from it will be reduced *pro rata*. S.A. § 2.10.

### D.    Class Notice and Settlement Administration

Notice to the Settlement Class and the costs of administration will be paid from the Settlement Fund. S.A. § 2.8. Angeion, a nationally recognized and well-regarded class action settlement administrator has been retained to serve here, subject to the Court's approval. Reflective of the nature of the Settlement Class, email addresses are available for the potential Class Members, and individual notice will be achieved primarily via email sent to the email addresses associated with the accounts of Google+ users in the U.S. as reflected in Google's records. S.A., §§ 4.1, 6.1.1. Notice will also be provided by the creation of a Settlement Website, available at [www.GooglePlusDataLitigation.com](www.GooglePlusDataLitigation.com), S.A., § 4.2, as well as via press release, attached hereto as **Exhibit 2**, issued through PR Newswire's US1 commercial newswire service and will also be posted on the Settlement Website and Class Counsel's respective firm websites. S.A., §§ 4.2, 4.3. Copies of all the notice documents are attached to this preliminary approval motion; they are clear and concise, and directly apprise Settlement Class Members of all the information they need to know to make a claim. Fed. R. Civ. P. 23(c)(2)(B).

### E.    Service Awards to Named Plaintiffs

Plaintiffs in this case have been integral in litigating this matter, including providing the entirety of their Google+ profiles to Google during informal discovery exchanged prior to the mediation in this case. All four representatives have been personally involved in the case and support the Settlement. Yanchunis Dec., ¶ 25. Plaintiffs will separately petition the Court to award each representative up to $1,500 in recognition of the time, effort, and expense they incurred pursuing claims that benefited the entire class. S.A., § 10.

### F.    Attorneys' Fees, Costs, and Expenses

Plaintiffs will also separately seek an award of attorneys' fees and reimbursement of litigation costs and expenses, not to exceed 25% of the Settlement Fund (i.e., $1,875,000). S.A., § 9.1, as well as $200,000 for additional costs. S.A. § 9.1. The request for fees, costs, and expenses

will encompass all effort and expenditures incurred by counsel and is within the sole discretion of this Court. S.A., § 9.1. The motion will be supported with detailed lodestar information and an accounting of expenses. Yanchunis Dec., ¶ 36. If the Court awards less than the amount sought by Class Counsel, that will not be a basis for setting aside this Settlement. S.A., § 9.1.

### G. Reduction or Residual

Importantly, this Settlement is non-reversionary. If the Net Settlement Fund is insufficient to cover the disbursement of $5.00 to each Settlement Class Member, all such claims will be reduced on a *pro rata* basis. S.A., § 2.10. Conversely, should there be a remaining amount, surplus funds will be used to increase the disbursement payments up to the $12.00 individual claim cap, S.A. § 2.10, the approximate full value of Personal Information stored in social media profiles. Yanchunis Dec., ¶¶ 30–33. If additional funds remain in the Net Settlement Fund following those two disbursements, then a neutral third party appointed by the Court will select a Cy Pres recipient or recipients, subject to this Court's approval. S.A. §§ 2.10, 2.12.

### H. Release

In exchange for the benefits provided under the Settlement Agreement, Settlement Class Members will release any claims against Google related to or arising from any of the facts alleged in the complaints filed in this litigation. S.A., §§ 7.1–7.6.

## IV. ARGUMENT

### A. The Settlement Class Should Be Preliminarily Certified

Before assessing the parties' settlement, the Court should first confirm the underlying settlement class meets the requirements of Rule 23. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997); Manual for Complex Litigation, § 21.632. The requirements are well known: numerosity, commonality, typicality, and adequacy—each of which is met here. Fed. R. Civ. P. 23(a); *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 979–80 (9th Cir. 2011).

#### 1. The Rule 23(a) Requirements Are Met

The Settlement Class is estimated to potentially include up to approximately ten million United States-based accounts, and so readily satisfies the numerosity requirement. *See* Fed. R. Civ. P. 23(a)(1). The commonality requirement, which requires that class members' claims "depend

upon a common contention" of such a nature that "determination of its truth or falsity will resolve an issue that is central to the validity of each [claim] in one stroke," is also met. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Here, Plaintiffs' claims turn on whether Google's security environment was adequate to protect Settlement Class Members' Personal Information. The resolution of that inquiry revolves around evidence that does not vary from class member to class member, and so can be fairly resolved—whether through litigation or settlement—for all class members at once.

Likewise, typicality and adequacy are easily met. Each proposed Settlement Class Representative alleges he or she was a Google+ user, with Personal Information stored on Google's servers, that was exposed to unauthorized third parties during the Data Leaks, and thus they were impacted by the same inadequate data security that they allege harmed the rest of the Class. *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1118 (9th Cir. 2017) ("[I]t is sufficient for typicality if the plaintiff endured a course of conduct directed against the class."). The Settlement Class Representatives also have no conflicts with the Settlement Class; have participated actively in the case, including thorough examination of their Google+ profiles to identify the personal and private nature of the Personal Information stored therein; and are represented by experienced attorneys who were previously appointed by this Court to represent Class Members' interests. (Dkt. No. 44); *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003) (adequacy satisfied if plaintiffs and their counsel lack conflicts of interest and are willing to prosecute the action vigorously on behalf of the class); Yanchunis Dec., ¶¶ 25, 27.

## 2. The Requirements of Rule 23(b) Are Met

"In addition to meeting the conditions imposed by Rule 23(a), the parties seeking class certification must also show that the action is maintainable under Fed. R. Civ. P. 23(b)(1), (2) or (3)." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998). Here, the Settlement Class is maintainable under Rule 23(b)(3), as common questions predominate over any questions affecting only individual members and class resolution is superior to other available methods for a fair and efficient resolution of the controversy. *Id*. Plaintiffs' claims depend, first and foremost, on whether Google used reasonable data security to protect consumers' Personal Information

stored in Google+ user profiles. That question can be resolved using the same evidence for all Settlement Class Members, and thus is the precise type of predominant question that makes a class-wide adjudication worthwhile. *See Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) ("When 'one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) … .'") (citation omitted).

Importantly, the predominance analysis in the settlement context need not consider manageability issues because "the proposal is that there be no trial," and hence manageability considerations are no hurdle to certification for purposes of settlement. *Amchem*, 521 U.S. at 620. There is only the predominant issue of whether Google failed to properly secure the Personal Information disclosed to unauthorized third parties during the Data Leaks and failed to provide timely notice, such that its users should now be provided a remedy. Resolution of that issue through individual actions is impracticable: the amount in dispute for individual class members is too small, the technical issues involved are too complex, and the required expert testimony and document review too costly. *See Just Film*, 847 F.3d at 1123. Rather, the class device is the superior method of adjudicating consumer claims arising from the Data Leaks—just as in other data breach cases where class-wide settlements have been approved. *See, e.g.*, *In re Yahoo! Inc. Cust. Data Sec. Breach Litig.*, No. 5:16-md-02752-LHK (N.D. Cal. July 20, 2019); *Parsons v. Kimpton Hotel & Rest. Group, LLC*, No. 3:16-cv-05387-VC (N.D. Cal. Jan. 9, 2019); *In re Anthem, Inc. Data Breach Litig.*, 327 F.R.D. 299, 316-17 (N.D. Cal. 2018); *In re LinkedIn User Privacy Litig.*, 309 F.R.D. 573, 585 (N.D. Cal. 2015).

### B. The Settlement Should be Preliminarily Approved

There is "relatively scant appellate authority regarding the standard that a district court must apply in reviewing a settlement at the preliminary approval stage." *In re High-Tech Emp. Antitrust Litig.*, No. 11-CV-02509-LHK, 2014 WL 3917126, at *3 (N.D. Cal. Aug. 8, 2014). In the past, courts have focused only on whether the proposed agreement appears to be non-collusive, is free of "obvious deficiencies," and generally falls within the range of "possible" approval. *See, e.g.*, *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1079-80 (N.D. Cal. 2007). Recently, however, several courts have criticized the notion that review at the preliminary approval stage

need only involve a "quick look," or a watered-down version of final approval. *See Cotter v. Lyft, Inc.*, 193 F. Supp. 3d 1030, 1036 (N.D. Cal. 2016); *O'Connor v. Uber Techs., Inc.*, 201 F. Supp. 3d 1110, 1122 (N.D. Cal. 2016).

Revisions to Rule 23—effective December 1, 2018—further confirm the need for a more detailed analysis. Rule 23(e)(1) now states:

> **(e) Settlement, Voluntary Dismissal, or Compromise.** The claims, issues, or defenses of a certified class—or a class proposed to be certified for purposes of settlement—may be settled, voluntarily dismissed, or compromised only with the court's approval. The following procedures apply to a proposed settlement, voluntary dismissal, or compromise:
>
> > **(1)** *Notice to the Class.*
> >
> > > **(A)** *Information That Parties Must Provide to the Court.* The parties must provide the court with information sufficient to enable it to determine whether to give notice of the proposal to the class.
> > >
> > > **(B)** *Grounds for a Decision to Give Notice.* The court must direct notice in a reasonable manner to all class members who would be bound by the proposal if giving notice is justified by the parties' showing that the court will likely be able to:
> > >
> > > > **(i)** approve the proposal under Rule 23(e)(2); and
> > > >
> > > > **(ii)** certify the class for purposes of judgment on the proposal.
> >
> > **(2)** *Approval of the Proposal.* If the proposal would bind class members, the court may approve it only after a hearing and only on finding that it is fair, reasonable, and adequate after considering whether:
> >
> > > **(A)** the class representatives and class counsel have adequately represented the class;
> > >
> > > **(B)** the proposal was negotiated at arm's length;
> > >
> > > **(C)** the relief provided for the class is adequate, taking into account:
> > >
> > > > **(i)** the costs, risks, and delay of trial and appeal;
> > > >
> > > > **(ii)** the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
> > > >
> > > > **(iii)** the terms of any proposed award of attorney's fees, including timing of payment; and
> > > >
> > > > **(iv)** any agreement required to be identified under Rule 23(e)(3); and
> > >
> > > **(D)** the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e). Thus, under the new rule, notice should be given to the class, and hence,

preliminary approval should only be granted, where the Court "will likely be able to" finally approve the settlement under Proposed Rule 23(e)(2) and certify the class for settlement purposes. *Id.*; Committee Notes on Rules – 2018 Amendment to Fed. R. Civ. P. 23.

Thus, the proposed rule reflects the factors already used in this Circuit for final approval: (1) the strength of the plaintiff's case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; (8) the reaction of the class members to the proposed settlement; and (9) whether the settlement is a product of collusion among the parties. *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011).

Accordingly, Plaintiffs will undertake here an analysis under the now-effective Rule 23(e), save for recognizing that at least one of those factors—the reaction of class members—is not yet known. Each weighs in favor of approval.

### 1. The Strength of Plaintiffs' Case

While Plaintiffs have built a strong liability case based on the value of information contained in Google+ profiles and shared with unauthorized third parties, as well as Google's public statements and chronology of Google's actions, including omissions to Congress, the viability of their causation and damages models on a class-wide basis remains subject to vigorous challenge from Google, subject to *Daubert* challenges, and is untested on a class-wide basis, including in this District, beyond the pleading stages and certainly at trial.

As to liability, Plaintiffs detailed in their Complaint the shortcomings in Google's information security environment despite representations to the contrary, the omissions Google made during congressional testimony, and the subsequent flaws in Google's attempts to remediate the First Data Leak, demonstrating Google's numerous failures. ¶¶ 20–36, 38–44, 48–52. Plaintiffs also established that key senior executives had contemporaneous knowledge of the First Data Leak, yet failed to provide notice to users and Congress until months later. ¶¶ 37–40. Finally, anticipating attacks to the harm from the Data Leaks, Plaintiffs provided potential damages

models, supported by well-regarded experts, to establish the predominance and manageability of class treatment. Yanchunis Dec., ¶¶ 30–32.

Yet, Defendants raise substantial questions of causation and damages—both as to the named Plaintiffs individually and as to any ability to prove causation or damages class-wide. (Dkt. No. 45, at 7–14). Google not only attacked injuries resulting from its alleged tortious behavior, but also argued the invasion of privacy could not proceed due to lack of intent, no reasonable expectation of privacy, and no breach of social norms. (Dkt. No. 45, at 15–16). Similarly, Google attacked alleged legal deficiencies in Plaintiffs' theories of breach of confidence, (Dkt. No. 45, at 17–18), and pleadings requirements under Rule 9 for Plaintiffs' fraud claims. (Dkt. No. 45, at 18–21). Concerning the sensitivity of information contained in Plaintiffs' profiles, Google contended much of that information was available publicly, and attacked the legal sufficiency of Plaintiffs' theory that, although some information may be gleaned from public sources, the aggregated nature of profiles enables hackers and other malicious actors to more easily perpetuate identity theft and other forms of fraud. (Dkt. No. 45, at 15–16); ¶¶ 53–63 (discussing value of aggregated personal information)).

The range of potential outcomes was thus vast. For example, Plaintiffs' expert Ian Ratner noted that the type of information contained in Google+ profiles derives value from remaining private and not falling into the hands of unauthorized third parties. Yanchunis Dec., ¶¶ 30, 31. Due to the Data Leaks, however, Google essentially granted access to users' Personal Information for free and conveyed value to unauthorized third parties without compensation to the rightful owners (i.e., the users) of that information. Yanchunis Dec., ¶ 31. Mr. Ratner justified this theory of damages via the Income Method, which analyzes what third parties pay to access the type of information stored and aggregated in a Google+ profile. Yanchunis Dec., ¶ 31. Mr. Ratner determined the range of transaction values for access to social media accounts ranges between $0.20 and $29.60, with an average of $2.50 per account. Yanchunis Dec., ¶ 31.

But Google challenged crucial issues applicable to this valuation, namely the amount of information users provided in Google+ profiles, the availability of that information from other sources, and the lack of proof of exfiltration and misuse, which affects the value of a potential

settlement for injuries to Class Members. Prior data breach settlements with proof of exfiltration indicate a value exceeding $1 per user. While the legal theory behind a larger average recovery per user may be sound, it remains untested, and, as a practical matter, Plaintiffs' counsel recognize that taking such large numbers to a jury presents substantial strategic risks. Yanchunis Dec., ¶ 29.

### 2. The Risk, Expense, Complexity, and Likely Duration of Further Litigation

While Plaintiffs believe their case is a strong one, all cases, including this one, are subject to substantial risk. This case involves millions of individuals, and a complicated and technical factual overlay lodged against a well-funded, technologically savvy, and motivated defendant. The damages methodologies, theoretically sound in Plaintiffs' view, remain untested in a disputed class certification setting and unproven in front of a jury. And—as in any data breach, but especially one of this scope and age—establishing causation and damages on a class-wide basis is an unexplored legal frontier rife with uncertainty.

Although nearly all class actions involve a high level of risk, expense, and complexity—undergirding the strong judicial policy favoring amicable resolutions, *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1238 (9th Cir. 1998)—this is an especially complex class in an especially risky arena. Historically, data breach cases faced substantial hurdles in surviving even past the pleading stage. *See, e.g.*, *Hammond v. The Bank of N.Y. Mellon Corp.*, No. 08 Civ. 6060 (RMB) (RLE), 2010 WL 2643307, at *1 (S.D.N.Y. June 25, 2010) (collecting cases). Even cases of similar wide-spread notoriety and implicating data far more sensitive than at issue here have been found wanting at the district court level. *In re U.S. Office of Pers. Mgmt. Data Sec. Breach Litig.*, 266 F. Supp. 3d 1, 19 (D.D.C. 2017) ("The Court is not persuaded that the factual allegations in the complaints are sufficient to establish . . . standing."), *reversed in part*, 928 F.3d 42 (D.C. Cir. June 21, 2019) (holding that "Plaintiffs had standing to bring [data breach] lawsuit [...]").

To the extent the law has gradually accepted this relatively new type of litigation, the path to a class-wide monetary judgment remains unforged; particularly in the area of damages. For now, data breach cases are among the most risky and uncertain of all class action litigation, making settlement the more prudent course when a reasonable deal is available.

By settling now, practical remedies that have been absent become imminently available. In the absence of proof that the information of the class was exfiltrated, this settlement offers consumers monetary relief through a simplified claims process, and Google has discontinued the Google+ platform for consumer use, thus assuaging the possibility of further dissemination of PII to unauthorized third parties. Even if Plaintiffs achieved a successful judgment, relief to Class Members would likely be forestalled for years following the exhaustion of appeals. Here then, delay only further delays compensation to Class Members they rightly deserve.

### 3. The Risk of Maintaining Class Action Status Through Trial

While Plaintiffs' case is still in the pleadings stage, the parties have not briefed and the Court has not yet certified any class treatment of this case. Certification of consumer data breach cases is rare—first occurring in *Smith v. Triad of Ala., LLC*, No. 1:14-CV-324-WKW, 2017 WL 1044692, at *6 (M.D. Ala. Mar. 17, 2017). While certification of additional consumer data breach classes should follow, the dearth of direct precedent adds to the risks posed by continued litigation.

### 4. The Amount Offered in Settlement

Google's total financial commitment under the Settlement Agreement is $7,500,000. S.A. §§ 1.48, 2.1. The Settlement Fund will be applied to pay all Notice and Administrative Costs, the taxes described within the Settlement Fund, the Fee, Cost, and Expense Award, and any Service Awards. S.A. § 2.8. The Settlement Fund will also be used to distribute Residual Settlement Payments (if any) to Approved Cy Pres Recipients. S.A. §§ 2.8, 2.10, 2.12. The Net Settlement Fund will be applied to Claimants in accordance with the Final Approval Order or any subsequent order of the Court. S.A. §§ 2.8, 2.9. The Net Settlement Fund will be allocated to Claimants on a pro rata basis up to a cash payment of US$5.00 per Claimant. S.A. §§ 2.8, 2.10. If there are insufficient funds to pay claimants $5.00 based on the number of claimants, the payment to each claimant will be reduced pro ratably. If sufficient funds remain after calculation of the aggregate initial maximum distribution of US$5.00 per Claimant, the allocation shall be recalculated on a *pro rata* basis up to a maximum distribution of up to US$12.00 per Claimant. S.A. §§ 2.8, 2.10. Under no circumstances will any Class Member receive more than $12.00. S.A. §§ 2.8, 2.10. Any funds remaining in the Net Settlement Fund after distribution(s) to Class Members will be

distributed to Cy Pres Recipients that have been selected by a neutral third party and approved by the Court. S.A. §§ 2.8, 2.10, 2.12. Plaintiffs believe the Settlement Fund will be more than ample enough to accommodate the amounts drawn from it, Yanchunis Dec., ¶¶ 22, 30–32, but, in the event it is not, all claims drawn from it will be reduced pro rata. S.A. § 2.10.

This is a fair and just outcome where the parties devoted financial resources to early resolution to benefit Class Members, instead of increasing Google's costs by litigating the issues described above. Yanchunis Dec., ¶¶ 14–16, 19–21.

### 5. The Extent of Discovery Completed and the Stage of Proceedings

Here, Plaintiffs vigorously and aggressively gathered all of Google's press releases related to this case—including statements to shareholders; publicly-available testimony from Google officers, directors, and employees provided to governmental and regulatory agencies; and other publicly-available documents concerning Google's announcements of the Data Leaks and failure to provide timely notice of the First Data Leak. Yanchunis Dec., ¶¶ 12–14, 28, 30–32.

Although the parties did not engage in formal discovery, Class Counsel's extensive experience in privacy and data protection practices since 1999 provided substantive knowledge on the subject to enable Class Counsel to represent Plaintiffs' and Class Members' interests without expending hundreds of hours and enormous financial resources to come up to speed on the subject area. Yanchunis Dec., ¶¶ 12–14, 28, 30–32. Class Counsel worked with cybersecurity expert Mary Frantz and her team at Enterprise Knowledge Partners to evaluate the Data Leaks, as well as assist with formulating discovery requests, including targeted interrogatories, requests for production, requests for admissions, and initial identification of crucial Google witnesses for depositions. Yanchunis Dec., ¶¶ 12, 13. Class Counsel also prepared Plaintiffs for intimate and detailed discovery, including providing and reviewing complete digital copies of their Google+ profiles, and preparing Plaintiffs for potential depositions in this case. Yanchunis Dec., ¶ 25.

Accordingly, Plaintiffs are well informed about their case, its assets and pitfalls, and have had the benefit of their experts' opinions in understanding the challenges of this case.

### 6. The Experience and View of Counsel

Class Counsel initiated this lawsuit when Google announced the First Data Leak—which

based on available information may have impacted hundreds of thousands of Google+ users (of which U.S.-based users would account for a substantially-lower amount)—far fewer than other blockbuster and headline-grabbing data breaches announced over the last few years. (Dkt. No. 1). When the Second Data Leak increased the number of potentially impacted Google+ users from hundreds of thousands of users to tens of millions of users worldwide (of which U.S.-based users are estimated to account for under 10 million users), Class Counsel were quick to amend and continue to represent the best interests of the class. The Court then appointed Class Counsel, charged with responsibilities to orderly and efficiently conduct litigation, such as discovery, expert retention, and settlement discussions, while avoiding unnecessary duplication and unproductive efforts. (Dkt. No. 44). Counsel representing the class, particularly John Yanchunis, has substantial experience litigating complex class cases of various natures, and extensive exposure to the highest profile data breach cases in the country. For example, Mr. Yanchunis serves as lead counsel in the *Yahoo!* data breach case and was a member of the Plaintiffs' Steering Committee who assisted his counsel in negotiating the settlement in Equifax, the largest settlement of a data breach case to date. Yanchunis Dec., ¶ 19 and accompanying Exhibit A thereto. Having worked on behalf of the putative class since the Data Leaks were first announced, evaluated the legal and factual disputes, and dedicated considerable time and monetary resources to this litigation, proposed Settlement Class Counsel endorse the Settlement without reservation. Yanchunis Dec., ¶¶ 19–22, 28, 37.

### 7. The Presence of a Government Participant

Although various investigations by governmental and regulatory authorities were commenced relating to the Data Leaks, Plaintiffs here pursued their claims independently. Should preliminary approval be granted, the United States Attorney General and Attorneys General of each of the States will be notified pursuant to the Class Action Fairness Act, 28 U.S.C. § 1715, and given an opportunity to raise any objections or concerns they may have. S.A., § 4.4.

### 8. The Reaction of the Class Members to the Proposed Settlement

Because notice has not yet been given, this factor is not yet implicated; however, Settlement Class Representatives all strongly support the Settlement. Yanchunis Dec., ¶ 33.

### 9. Lack of Collusion Among the Parties

Here, the parties negotiated a substantial Settlement Fund, making available $7,500,000 million to resolve this case. The parties did not commence discussion of fees until agreement on all substantive portions of the class resolution had been reached, and both the class portion of the resolution and the fees were negotiated at arm's-length under the direction of the parties' mutually-agreed upon mediator Mr. Randall Wulff, who has extensive experience litigating complex commercial, intellectual property, securities, and insurance cases, among others, for more than 20 years, and has mediated in excess of 2,000 cases—including a $1.1 billion class action settlement concerning antitrust claims against Microsoft, and leading panels concerning recovery for property damages claims resulting from the tragedy on September 11, 2001. http://www.wqsadr.com/randallwwulff.html; *see G. F. v. Contra Costa Cty.*, No. 13-cv-03667-MEJ, 2015 WL 4606078, at *13 (N.D. Cal. July 30, 2015) ("[T]he assistance of an experienced mediator in the settlement process confirms that the settlement is non-collusive.") (internal quotation marks and citation omitted).

### C. The Proposed Notice Plan Should Be Approved

Rule 23 requires that prior to final approval, the "court must direct notice in a reasonable manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1). For classes certified under Rule 23(b)(3), "the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). Under now-amended Rule 23(c)(2)(B), "[t]he notice may be by one or more of the following: United States mail, electronic means, or other appropriate means." Fed. R. Civ. P. 23(c)(2)(B).

Here, because email addresses are available for the Class Members, the chief vector of direct, individual notice will be via email. Even prior to the above-noted change in Rule 23 expressly permitting electronic notice, email notice in similar circumstances has been found appropriate. *See, e.g., Spann v. J.C. Penney Corp.*, 314 F.R.D. 312, 331 (C.D. Cal. 2016). Substitute notice will also be provided by the creation of a Settlement Website, available at www.GooglePlusDataLitigation.com, as well as via press release issued through PR Newswire's

US1 commercial newswire service and will also be posted on the Settlement Website. S.A., §§ 4.1-4.3.2. Copies of all the notice documents are attached to this preliminary approval motion; they are clear and concise, and directly apprise Settlement Class Members of all the information they need to know to make a claim. Fed. R. Civ. P. 23(c)(2)(B).

Moreover, on the dedicated Settlement Website, Class Members are able to review the detailed Long Form Notice, which provides clear and concise information with respect to all the relevant aspects of the litigation. Thus, the Notice provides all the information necessary for Settlement Class Members to make informed decisions with respect to whether they remain in or opt out of the Settlement Class, or object to the proposed Settlement. Yanchunis Dec., ¶¶ 22, 37–42. The Notice Plan has been developed by a provider with significant experience in designing notice plans in large and national class actions similar to this one. Yanchunis Dec., ¶¶ 22, 37–42.

Accordingly, the content and method of dissemination of the proposed Notice fully comports with the requirements of due process, the now-amended Federal Rules of Civil Procedure, and applicable case law, and the Court should approve the proposed Notice and direct that it be distributed as agreed by the parties.

### D. Appointment of the Settlement Administrator

In connection with implementation of the notice plan and administration of the settlement benefits, the parties seek the Court to appoint Angeion to serve as the Settlement Administrator. Angeion has a trusted and proven track record of supporting over 2,000 class action administrations and the distribution of over $10 billion to class members. Notice and administration is expected to cost approximately $265,000. Yanchunis Dec., ¶ 22.

### E. Appointment of Settlement Class Counsel

Under Rule 23, "a court that certifies a class must appoint class counsel [who must] fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1)(B). In making this determination, courts generally consider the following attributes: the proposed class counsel's (1) work in identifying or investigating potential claims, (2) experience in handling class actions or other complex litigation, and the types of claims asserted in the case, (3) knowledge of the applicable law, and (4) resources committed to representing the class. Fed. R. Civ. P.

23(g)(1)(A)(i–iv).

Here, proposed Settlement Class Counsel have extensive experience prosecuting class action cases, and specifically data breach cases, and were previously appointed by this Court. (*See* Dkt. Nos. 27-2, 27-3). Accordingly, the Court should appoint John Yanchunis, Ryan J. McGee, and Jonathan B. Cohen of Morgan & Morgan Complex Litigation Group, Clayeo C. Arnold and Joshua H. Watson of Clayeo C. Arnold Professional Law Corporation, and Ivy T. Ngo of Franklin D. Azar & Associates as Class Counsel.

### F. Appointment of Special Master to Designate Cy Pres Recipients

The Settlement Agreement provides that Cy Pres Recipients shall be designated by a special master to be appointed by the Court. As set forth in the Proposed Order submitted herewith as **Exhibit 3**, the parties propose appointment of former Magistrate Judge Elizabeth LaPorte of JAMS (or another neutral to be selected by the Court), who will review applications from non-profit entities and recommend applicants to be selected as Approved Cy Pres Recipients.

### G. Schedule for Final Approval

Once the Court has ruled on the motion for preliminary approval, the timeline for providing notice, opting out of the Settlement Class, and submitting claims will begin to run. Plaintiffs provided an agreed-upon schedule in their Proposed Order granting this Motion.

## V. CONCLUSION

In light of the significant benefits provided by the Settlement, Plaintiffs respectfully request that the Court grant Plaintiffs' Motion for Preliminary Approval. Google does not oppose Plaintiffs' Motion for Preliminary Approval.

Dated: January 6, 2020

Respectfully submitted,

*/s/ John A. Yanchunis*
John A. Yanchunis (*pro hac vice*)
Ryan J. McGee (*pro hac vice*)
Jonathan B. Cohen (*pro hac vice*)
**Morgan & Morgan**
**Complex Litigation Group**

and

Clayeo C. Arnold (65070)
Joshua H. Watson (238058)
**Clayeo C. Arnold, P.C.**
*Counsel for Plaintiffs Matic and Harris*

and

Ivy T. Ngo (249860)
**Franklin D. Azar & Associates, P.C.**
*Counsel for Plaintiffs Olson and Pinkowski*

## CERTIFICATE OF SERVICE

I hereby certify that on January 6, 2020, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on January 6, 2020.

*/s/ John A. Yanchunis*

John A. Yanchunis (admitted *pro hac vice*)