JOHN A. YANCHUNIS (*pro hac vice*)
jyanchunis@forthepeople.com
RYAN J. McGEE (*pro hac vice*)
rmcgee@forthepeople.com
**MORGAN & MORGAN**
**COMPLEX LITIGATION GROUP**
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
Telephone:   (813) 223-5505
Facsimile:    (813) 223-5402

Clayeo C. Arnold, SBN 65070
carnold@justice4you.com
Joshua H. Watson, SBN 238058
jwatson@justice4you.com
**CLAYEO C. ARNOLD**
**A PROFESSIONAL LAW**
**CORPORATION**
865 Howe Avenue
Sacramento, California 95825
Telephone:    (916) 777-7777
Facsimile:     (916) 924-1829

FRANKLIN D. AZAR (*pro hac vice*)
azarf@fdazar.com
MARGEAUX R. AZAR (*pro hac vice*)
azarm@fdazar.com
**FRANKLIN D. AZAR & ASSOCIATES, P.C.**
14426 East Evans Avenue
Aurora, Colorado 80014
Telephone:    (303) 757-3300
Facsimile:     (720) 213-5131

*Appointed Class Counsel*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| IN RE GOOGLE PLUS PROFILE LITIGATION | No. 5:18-CV-06164 (VKD) |
| | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR ATTORNEYS' FEES, COSTS, AND EXPENSES AND SERVICE AWARDS** |
| | Date:          November 19, 2020 |
| | Time:          9:00 A.M. |
| | Courtroom:   4 |
| | Judge:         Hon. Edward J. Davila |

## TABLE OF CONTENTS

I.      INTRODUCTION...........................................................................................................1

II.     ARGUMENT .................................................................................................................2

        A.      Percentage-of-the-Fund Analysis...............................................................4

                1.      The Benefits Achieved are Exceptional.......................................4

                2.      The Risk and Contingent Nature of the Case...............................6

                3.      The Skill Required to Prosecute this Action Effectively ...........10

                4.      Awards in Similar Cases .............................................................11

        B.      The Request is Reasonable Under the Lodestar Cross-Check.............11

                1.      The Benefits Achieved are Exceptional.....................................12

                2.      Class Counsel Provided Outstanding Representation in an Area of Law with Complex and Novel Issues ...............................................................12

                3.      The Risk of Nonpayment was Substantial and Supports the Requested Award of Attorneys' Fees..........................................................................13

                4.      The Remaining Factors Support the Cross-Check.....................14

        C.      The Requested Expenses are Reasonable ............................................16

        D.      Service Award Request Is Reasonable ................................................17

III.    CONCLUSION...........................................................................................................17

# <u>TABLE OF AUTHORITIES</u>

*Acosta v. Frito-Lay, Inc.*, No. 15-CV-02128-JSC, 2018 WL 646691, at *11 (N.D. Cal. Jan. 31, 2018) ........................................................................................................ 16

*Adkins v. Facebook*, No. C 18-05982 WHA, 2019 WL 7212315 (N.D. Cal. Nov. 26, 2019) ........................................................................................... 7, 12, 13, 14

*Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984) ......................................................... 15

*Fulton-Green v. Accolade, Inc.*, 2019 WL 4677954, *12 (E.D. Pa. Sept. 24, 2019) .................. 15

*Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983) ......................................................... 4

*In re Anthem, Inc. Data Breach Litig.*, No. 15-MD-02617-LHK, 2018 WL 3960068 (N.D. Cal. Aug. 17, 2018).............................................................. 4, 6, 7, 16, 17

*In re Capital One Consumer Data Sec. Breach Litig.*, --- F. Supp. 3d ---, 2020 WL 5629790 (E.D. Va. Sept. 18, 2020)..................................................... 13

*In re Bluetooth Headset Products Liab. Litig.*, 654 F.3d 935, 942 (9th Cir. 2011).................... 2, 3

*In re Equifax Inc. Customer Data Sec. Breach Litig.*, 1:17-MD-2800-TWT, 2020 WL 256132 (March 17, 2020) .................................................. 4, 6, 7, 11, 15

*In re Hannaford Bros. Co. Customer Data Sec. Breach Litig.*, 293 F.R.D. 21 (D. Me. 2013) ........................................................................................................ 7

*In re Immune Response Sec. Litig.*, 497 F. Supp. 2d 1166, 1176 (S.D. Cal. 2007) .................... 14

*In re Google Referrer Header Privacy Litig.*, 869 F.3d 737, 738 (9th Cir. 2017) .................... 11

*In re Nat'l Collegiate Athletic Assoc. Athletic Grant-in-Aid Cap Antitrust Litig.*, 768 F. App'x 651, 653-54 (9th Cir. 2019);.................................................... 3

*In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1046 (N.D. Cal. 2008)........................ 4

*In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 947 (9th Cir. 2015) ...................... 17

*In re Quantum Health Res.*, 962 F. Supp. 1254, 1257-58 (C.D. Cal. 1997)........................ 3

*In re Rite Aid Corp. Secs. Litig.*, 396 F.3d 294, 306 (3d Cir. 2005) ............................ 14

*In re TJX Companies Retail Sec. Breach Litig.*, 246 F.R.D. 389 (D. Mass. 2007) .................... 7

*In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, 2020 WL 4212811 (N.D. Cal. July 22, 2020)............................................................... 6, 11, 13, 15

*In re Yahoo Mail Litig.*, 2016 WL 4474612, at *11 (N.D. Cal. Aug. 25, 2016)........................ 17

*Moreno v. City of Sacramento*, 534 F.3d 1106, 1112 (9th Cir. 2008) ........................ 15

*Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 272 (9th Cir. 1989)................ 2

*Perez v. Rash Curtis & Associates*, 2020 WL 1904533 (N.D. Cal. April 17, 2020).............. 11, 12

*Six Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990)................ 2, 3

*Smith v. Triad of Alabama, LLC*, 2017 WL 1044692 .......................................... 6, 9, 14

*So. Indep. Bank v Fred's Inc.*, No. 2:15-cv-00799 (M.D. Ala. Mar. 13, 2019)............................ 7

*Staton v. Boeing Co.*, 327 F.3d 938, 965 (9th Cir. 2003) ............................................... 3

*Vincent v. Hughes Air W., Inc.*, 557 F.2d 759, 769 (9th Cir. 1977)................................. 16

*Wininger v. SI Mgmt. L.P.*, 301 F.3d 1115, 1121 (9th Cir. 2002). .................................. 16

## I.       INTRODUCTION

In October and December 2018, Google[1] acknowledged that software bugs in its Google+ social media platform permitted the exposure of Google+ users' information to unauthorized third parties (collectively, the "Data Disclosures"), including the users' names, genders, and email addresses, as well as additional profile fields, such as the users' occupations and places lived. ("Personal Information").

Following the filing of class action complaints, John Yanchunis retained experts in the areas of cybersecurity, dark web valuations, and financial modeling; consolidated the plaintiffs and causes of action for the purposes of the operative Amended Consolidated Class Action Complaint (the "Complaint"); fully briefed dispositive motions and responses thereto; exchanged informal discovery; and engaged in a day-long mediation session. At the arms-length mediation conducted by renown mediator Randall C. Wulff, the parties reached a resolution that—if accepted—will resolve all pending litigation and provide substantive relief to class members.

On April 2, 2019, Google took its Google+ social media platform offline, thus alleviating any further need for revised information and data security business practices.

The Settlement provides a $7,500,000 non-reversionary Settlement Fund for the benefit of the Class. The Settlement Fund will be used for disbursements to claimants, as well as for administrative costs, service awards, and any fees, costs, and expenses sought by Class Counsel ("Net Settlement Fund"). The Net Settlement Fund is to be allocated to claimants on a pro rata basis depending on the claims made by Class Members and potential distribution to Cy Pres Recipients that have been selected by a neutral third party and approved by the Court.

In compensation for their efforts, and in accord with the Settlement, S.A. § 9.1, and this Court's Order granting preliminary approval, (Dkt. No. 71 at 10), Class Counsel seek fees that comprise 25% ($1,875,000.00) of the $7,500,000.00 non-reversionary Settlement Fund made available to the Class as a result of the Settlement. This fee request accords exactly with the Ninth Circuit's 25% "benchmark," and reflects a 1.85 multiplier for current and anticipated lodestar.

---

[1] Unless otherwise noted, all capitalized terms are defined in the Settlement Agreement and Release ("Settlement Agreement" or "Settlement") (Dkt. No. 57-2).

1   Presently, the 2.73 multiplier based on Class Counsel's current lodestar of $687,980.60. This

2   lodestar calculation does not consider Class Counsel's future fees and costs spent responding to

3   objections, preparing and finalizing the Motion for Final Approval, handling any appeals taken,

4   and overseeing the administration of the Settlement to finality, which is reasonably estimated to

5   take 500 hours at an estimated blended rate of $650 per hour, for a total of $325,000.00. Taking

6   into account that total, the anticipated lodestar would be $1,012,980.60, which reflects a 1.85

7   multiplier. Plaintiffs also seek $69,603.23 in litigation costs, comprising the reasonable $64,603.23

8   incurred to date and an anticipated additional need of $5,000, well below the agreed upon and

9   anticipated $200,000.00 from the Settlement Agreement, reflecting Class Counsel's commitment

10  to an efficient prosecution of this case. SA § 9.1. Finally, Plaintiffs seek modest Service Awards

11  of $1,500 per Plaintiff as appointed representatives of the Class.

12      The fees, costs, and expenses sought here are factually well-supported by the declarations

13  of counsel, including biographic backgrounds, lodestar totals, expense breakdowns, and detailed

14  time records.

15  **II.    ARGUMENT**

16      "Under Ninth Circuit law, the district court has discretion in common fund cases to choose

17  either the percentage-of-the-fund or the lodestar method." *In re Bluetooth Headset Products Liab.*

18  *Litig.*, 654 F.3d 935, 942 (9th Cir. 2011). "[T]he choice between lodestar and percentage

19  calculation depends on the circumstances, but 'either method may . . . have its place in determining

20  what would be reasonable compensation for creating a common fund.'" *Six Mexican Workers v.*

21  *Ariz. Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990) (ellipsis in original) (quoting *Paul,*

22  *Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 272 (9th Cir. 1989)). The Ninth Circuit also

23  "encourage[s] courts to guard against an unreasonable result by cross-checking their calculations

24  against a second method." *In re Bluetooth*, 654 F.3d at 944–45. And, while perhaps a relevant

25  overall consideration, the size of the fund—including so-called "megafunds"—dictates neither the

26

27

28

1   principal methodology (*i.e.*, percentage versus lodestar) nor the specific values (*i.e.*, percentage

2   value or lodestar multiplier) applied in considering reasonableness of the requested fee.[2]

3       Where the percentage-of-recovery method is employed, it is well established that 25% of

4   the common fund is the "benchmark" award of attorney's fees. *See, e.g.*, *In re Bluetooth*, 654 F.3d

5   at 942 ("[C]ourts typically calculate 25% of the fund as the 'benchmark' for a reasonable fee

6   award, providing adequate explanation in the record of any 'special circumstances' justifying a

7   departure."); *Six Mexican Workers*, 904 F.2d at 1311 (same). Upward departures may be warranted

8   in particular circumstances, while downward departures may be warranted, for instance, where

9   there is no "realistic risk of nonrecovery." *In re Quantum Health Res.*, 962 F. Supp. 1254, 1257-

10  58 (C.D. Cal. 1997). Whether upward or downward, departures from the 25% "benchmark" require

11  consideration of the relevant factors at play in each instance. *In re Bluetooth*, 654 F.3d at 942.

12      Under the lodestar method, a "lodestar figure is calculated by multiplying the number of

13  hours the prevailing party reasonably expended on the litigation (as supported by adequate

14  documentation) by a reasonable hourly rate for the region and for the experience of the lawyer." *In*

15  *re Bluetooth*, 654 F.3d at 941 (citing *Staton v. Boeing Co.*, 327 F.3d 938, 965 (9th Cir. 2003)). The

16  Court may adjust this lodestar figure "upward or downward by an appropriate positive or negative

17  multiplier reflecting a host of 'reasonableness' factors." *Id.* at 941–42.

18      Whether the Court utilizes the 25% benchmark amount or some other rate, the award must

19  be supported "by findings that take into account all of the circumstances of the case." *Vizcaino v.*

20  *Microsoft Corp.*, 290 F.3d 1043, 1048 (9th Cir. 2002). The Ninth Circuit has identified five factors

21  that may inform this inquiry: (1) the results achieved; (2) the risk of litigation; (3) the skill required

22  and the quality of work; (4) the contingent nature of the fee and the financial burden carried by the

23  plaintiffs; and (5) awards made in similar cases. *Id.* at 1048–50.

24

25

26

27  [2] *See In re Nat'l Collegiate Athletic Assoc. Athletic Grant-in-Aid Cap Antitrust Litig.*, 768 F. App'x 651, 653-54 (9th Cir. 2019); *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047 (9th Cir. 2002)

28  (expressly declining to adopt so-called "increase-decrease" rule in which percentage of award generally decreases as amount of fund increases).

### A.      Percentage-of-the-Fund Analysis

As a preliminary matter, the nature of this action warrants application of percentage-of-the-fund approach as the principal method determining the reasonableness of Class Counsel's fee request. As courts recognize, this method "is commonly used in the legal marketplace to determine attorneys' fees in contingency fee cases." *In re Anthem, Inc. Data Breach Litig.*, No. 15-MD-02617-LHK, 2018 WL 3960068, at *5 (N.D. Cal. Aug. 17, 2018). Further, the novel and complex nature of this data breach action affords a dearth of established precedent and other guidance by which to employ the lodestar method. *See id.* ("[T]he combination of novel legal issues and technical subject matter present in the instant [data breach] case counsels against the lodestar method because there is no set baseline against which to compare whether hours were reasonably expended."). Other considerations also command using the percentage approach here, including (1) replicating more accurately the manner that plaintiffs' lawyers practice outside of the class action context, (2) ensuring that class counsel's interests are more directly aligned with the interests of the class, (3) rewarding counsel for assuming the risks of litigating a matter, and (4) avoiding the trappings often associated with the lodestar method, such as encouraging counsel to bill time and to find reasons to do so. *See* 5 Newberg on Class Actions §§ 15:62, 15:65 (5th ed. 2018); *see also In re Anthem*, 2018 WL 3960068, at *5-6; *In re Equifax Inc. Customer Data Sec. Breach Litig.*, 1:17-MD-2800-TWT, 2020 WL 256132, at *36 (N.D. Ga. March 17, 2020).

Class Counsel seeks an award of 25%, a percentage value directly on par with the Ninth Circuit's well-established benchmark of 25%. *See Vizcaino*, 290 F.3d at 1047 (affirming fee award based on 28% of $95 million cash settlement fund, and analyzing percentage-based fee awards between 1996 and 2001 in large common fund cases); *In re Anthem*, 2018 WL 3960068, at *15. As shown below, the percentage also falls in line with the actual percentage fee awards in this District.

### 1.      The Benefits Achieved are Exceptional

"The overall result and benefit to the class from the litigation is the most critical factor in granting a fee award." *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1046 (N.D. Cal. 2008); *see also Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983) ("most critical factor" in considering the

1    reasonableness of fee request is "degree of success obtained"). The case presented obvious

2    difficulties beyond those faced in data breach cases due to the absence of proof that any personal

3    information may have been obtained by unauthorized parties, and in particular, that if there had

4    been, it would have been extremely improbable that the acquisition of personal information would

5    have been at scale. In addition, the information contained in the accounts of Class Members was

6    of the type that would not be useable by itself to commit identify theft. In light of these facts, the

7    Settlement affords the class exceptional relief—monetary benefits carefully negotiated by Class

8    Counsel to definitively right the wrongs underlying this action. The non-monetary benefits have

9    already been achieved: Google shut down the social media platform and, therefore, there is no

10   future risk to Class Members.

11          Google's total financial commitment under the Settlement Agreement is $7,500,000. S.A.

12   §§ 1.48, 2.1. The Settlement Fund will be applied to pay all Notice and Administrative Costs, the

13   taxes described within the Settlement Fund, the Fee, Cost, and Expense Award, and any Service

14   Awards. S.A. § 2.8. The Settlement Fund will also be used to distribute Residual Settlement

15   Payments (if any) to Approved Cy Pres Recipients. *Id*. The Net Settlement Fund will be applied

16   to claimants in accordance with the Final Approval Order or any subsequent order of the Court.

17   *Id*. The Net Settlement Fund will be allocated to claimants on a pro rata basis up to an initial cash

18   payment of $5.00 per claimant. S.A. § 2.8. If there are insufficient funds to pay claimants $5.00

19   based on the number of claimants, the payment to each claimant will be reduced pro ratably. If

20   sufficient funds remain after calculation of the aggregate initial maximum distribution of $5.00

21   per claimant, the allocation shall be recalculated on a pro rata basis up to a maximum distribution

22   of up to $12.00 per claimant. *Id*. Under no circumstances will any Class Member receive more

23   than $12.00. *Id*. Any funds remaining in the Net Settlement Fund after distribution(s) to Class

24   Members will be distributed to Cy Pres Recipients that have been selected by a neutral third party

25   and approved by the Court. *Id*. Plaintiffs believe the Settlement Fund will be more than ample

26   enough to accommodate the amounts drawn from it, Yanchunis Prelim. App. Dec. ¶¶ 12–14, 28,

27   30-32; but, in the event it is not, all claims drawn from it will be reduced pro rata. S.A. § 2.10.

28   This is a fair and just outcome where the parties devoted financial resources to early resolution to

1  benefit Class Members, instead of increasing Google's costs by litigating the issues described

2  above. Yanchunis Prelim. App. Dec. ¶¶ 14–16, 19–21.

3        U.S.-based Class Members are estimated to account for under 10 million of the tens of

4  millions of users impacted world-wide. Thus, on a per-member basis and comparison, this

5  Settlement is favorable. *See, e.g.*, *In re The Home Depot, Inc. Customer Data Sec. Breach Litig.*,

6  2016 WL 6902351 (N.D. Ga. Aug. 23, 2016) (cash value of $28.4 million for approximately 52

7  million impacted consumers, with alleged data exfiltration); *In re Target Corp. Customer Data*

8  *Sec. Breach Litig.*, 2017 WL 2178306 (D. Minn. May 17, 2017) (cash value of $23.3 million for

9  approximately 110 million impacted consumers, with alleged data exfiltration); *In re Equifax*,

10  2020 WL 256132 ($380.5 million for approximately 147 million impacted consumers, with alleged

11  data exfiltration); *In re Anthem*, 2018 WL 3960068 (N.D. Cal. Aug. 17, 2018) (cash value of $115

12  million for approximately 79 million impacted consumers, with alleged data exfiltration); *In re*

13  *Yahoo! Inc. Customer Data Sec. Breach Litig.*, 2020 WL 4212811 (N.D. Cal. July 22, 2020) (cash

14  value of $117.5 million for approximately 194 million impacted consumers, with alleged data

15  exfiltration). Comparing the benefits of this Settlement with these prominent data breach cases, it

16  is plainly apparent that the benefits achieved for Class Members—whose information was

17  disseminated to third-party vendors Google had already vetted for receipt of that information upon

18  a user's consent—are fair and just.

19        **2.**      **The Risk and Contingent Nature of the Case**

20        "The law in data breach litigation remains uncertain and the applicable legal principles

21  have continued to evolve . . . ." *In re Equifax*, 2020 WL 256132, at *32. In this case, the action

22  settled before the Court ruled on Google's motion to dismiss and before Plaintiffs' moved for class

23  certification, a high-stakes endeavor, inherently fraught with risks and bearing enormous

24  consequences, especially in the nascent legal landscape of data breach litigation. Certification of

25  consumer data breach cases is rare—first occurring in *Smith v. Triad of Alabama, LLC*, 2017 WL

26  1044692, at *6 (M.D. Ala. Mar. 17, 2017). Success at class certification has been mostly

27  nonexistent in these cases, recently resulting, in this District, in success for only an injunctive

28

1   class.[3] Success on "class certification was not guaranteed, in part because Plaintiffs had a scarcity

2   of precedent to draw on." 2018 WL 3960068, at *12. That said, even if this Court had granted in

3   full Plaintiffs' anticipated motion for class certification, the inherent risks attendant to trying a data

4   breach class action would have only magnified the difficult legal questions at issue here. *See, e.g.*,

5   *In re Anthem*, 2018 WL 3960068, at *12; *In re Equifax*, 2020 WL 256132, at *32–33.

6           While Plaintiffs have built a strong liability case, the path to a successful conclusion in

7   favor of Plaintiffs and the Class was extremely difficult based on the limited value of information

8   contained in Google+ profiles and what may have been exposed to unauthorized third parties, as

9   well as the chronology of Google's actions, as well as the viability of the their causation and

10  damages models on a class-wide basis. Each of these problems would have been exploited by

11  Google, would be met with *Daubert* challenges, and even in the absence of these problems the

12  theories of the case remain considerably untested on a class-wide basis, including in this District,

13  beyond the pleading stages and certainly at trial. Defendant raised also substantial questions of

14  causation and damages—both as to the named Plaintiffs individually and as to any ability to prove

15  causation or damages class-wide. (Dkt. No. 45, at 7–14). Google not only attacked injuries

16  resulting from its alleged tortious behavior, but also argued the invasion of privacy could not

17  proceed due to lack of intent, no reasonable expectation of privacy, and no breach of social norms.

18  (Dkt. No. 45, at 15–16). Similarly, Google attacked alleged legal deficiencies in Plaintiffs' theories

19  of breach of confidence and pleadings requirements under Rule 9 for Plaintiffs' fraud claims. (Dkt.

20  No. 45, at 17–21). Concerning the sensitivity of information contained in Plaintiffs' profiles,

21  Google contended much of that information was available publicly, and attacked the legal

22  sufficiency of Plaintiffs' theory that, although some information may be gleaned from public

23  sources, the aggregated nature of profiles enables hackers and other malicious actors to more easily

24

25

---

26  [3] *See Adkins v. Facebook*, No. C 18-05982 WHA, 2019 WL 7212315, *9 (N.D. Cal. Nov. 26, 2019) (granting motion to certify injunctive-only class, but denying motion to certify damages and issues classes in data breach class action); *So. Indep. Bank v Fred's Inc.*, No. 2:15-cv-00799 (M.D. Ala. Mar. 13, 2019) (denying data breach case motion for class certification); *In re Hannaford Bros. Co. Customer Data Sec. Breach Litig.*, 293 F.R.D. 21 (D. Me. 2013) (same); *In re TJX Companies Retail Sec. Breach Litig.*, 246 F.R.D. 389 (D. Mass. 2007) (same).

1    perpetuate identity theft and other forms of fraud. (Dkt. 45, at 15–16); (Dkt. 37, at ¶¶ 53–63

2    (discussing value of aggregated personal information)).

3         The range of potential outcomes was thus vast. For example, Plaintiffs' expert Ian Ratner

4    noted that the type of information contained in Google+ profiles derives value from remaining

5    private and not falling into the hands of unauthorized third parties. Yanchunis Prelim. App. Dec.

6    ¶¶ 30–31. Due to the Data Leaks, however, Google essentially granted access to users' Personal

7    Information for free and conveyed value to unauthorized third parties without compensation to the

8    rightful owners (i.e., the users) of that information. Yanchunis Prelim. App. Dec. ¶ 31. Mr. Ratner

9    justified this theory of damages via the Income Method, which analyzes what third parties pay to

10   access the type of information stored and aggregated in a Google+ profile. Yanchunis Prelim. App.

11   Dec. ¶ 31. Mr. Ratner determined the range of transaction values for access to social media

12   accounts ranges between $0.20 and $29.60, with an average of $2.50 per account. Yanchunis

13   Prelim. App. Dec. ¶ 31. Google, however, challenged crucial issues applicable to this valuation,

14   namely the amount of information users provided in Google+ profiles, the availability of that

15   information from other sources, and the lack of proof of exfiltration and misuse. Prior data breach

16   settlements with proof of exfiltration indicate a value exceeding $1 per user. While the legal theory

17   behind a larger average recovery per user may be sound, it remains untested, and, as a practical

18   matter, Class Counsel recognize that taking such large numbers to a jury presents substantial

19   strategic risks. Yanchunis Prelim. App. Dec. ¶ 23.

20        All cases, including this one, are subject to substantial risk. This case involves millions of

21   individuals, and a complicated and technical factual overlay lodged against a well-funded,

22   technologically savvy, and motivated defendant. The damages methodologies, theoretically sound

23   in Plaintiffs' view, remain untested in a disputed class certification setting and unproven in front

24   of a jury. And—as in any data breach, but especially one of this scope and age—establishing

25   causation and damages on a class-wide basis is an unexplored legal frontier rife with uncertainty.

26   Although nearly all class actions involve a high level of risk, expense, and complexity—

27   undergirding the strong judicial policy favoring amicable resolutions, *Linney v. Cellular Alaska*

28   *P'ship*, 151 F.3d 1234, 1238 (9th Cir. 1998)—this is an especially complex class in an especially

1    risky area. Historically, even data breach cases (of which this is not one) faced substantial hurdles

2    in surviving even past the pleading stage. *See, e.g.*, *Hammond v. The Bank of N.Y. Mellon Corp*.,

3    2010 WL 2643307, at \*1 (S.D.N.Y. June 25, 2010) (collecting cases). Even cases of similar wide-

4    spread notoriety and implicating data far more sensitive than at issue here have been found wanting

5    at the district court level. *See, e.g.*, *In re U.S. Office of Pers. Mgmt. Data Sec. Breach Litig*., 266

6    F. Supp. 3d 1, 19 (D.D.C. 2017) ("The Court is not persuaded that the factual allegations in the

7    complaints are sufficient to establish . . . standing."), *reversed in part*, 928 F.3d 42 (D.C. Cir. June

8    21, 2019) (holding that "Plaintiffs had standing to bring [data breach] lawsuit […]"); *see also In*

9    *re Uber Tech., Inc., Data Sec. Breach Litig.*, 2019 WL 6522843 (C.D. Cal. Aug. 19, 2019)

10   (dismissing for lack of standing for information including names, email addresses, mobile phone

11   numbers, and driver's license numbers); *In re Sony Gaming Networks & Customer Data Sec.*

12   *Breach Litig.*, 903 F. Supp. 2d 942, 966 (S.D. Cal. 2012) (loss of personal information and

13   allegations of a heightened risk of identity theft, without more, calls standing into question).

14   Although Plaintiffs' case is still in the pleadings stage, the parties have not briefed and the Court

15   has not yet certified any class treatment of this case. As noted, certification of consumer data

16   breach cases is rare—first occurring in *Smith*, 2017 WL 1044692, at \*6. While certification of

17   additional consumer data breach classes should follow, the dearth of direct precedent adds to the

18   risks posed by continued litigation.

19           To the extent the law has gradually accepted this relatively new type of litigation, the path

20   to a class-wide monetary judgment remains unforged; particularly in the area of damages. For now,

21   data breach cases are among the most risky and uncertain of all class action litigation, making

22   settlement the more prudent course when a reasonable deal is available. By settling and paying

23   Class Members now, practical remedies that have been absent become imminently available. In

24   the absence of proof that the information of the class was exfiltrated, this Settlement offers

25   consumers monetary relief through a simplified claims process, and Google has discontinued the

26   Google+ platform, thus assuaging the possibility of further dissemination of PII to unauthorized

27   third parties. Even if Plaintiffs achieved a successful judgment, relief to Class Members would

28

1   likely be forestalled for years following the exhaustion of appeals. Here then, delay only further

2   delays compensation to Class Members they rightly deserve.

### 3.      The Skill Required to Prosecute this Action Effectively

4       This case required the highest level of experience and skill. Class Counsel includes Mr.

5   Yanchunis, recognized by bench and bar nationally for his extensive experience in class actions

6   and in data breach cases. Of course, Class Counsel are each well credentialed, as established in the

7   attached Declaration of John A. Yanchunis ("Yanchis Fee Decl."), attached hereto as **Exhibit 1**,

8   at ¶¶ 4–6; Declaration of Franklin D. Azar ("Azar Fee Decl."), attached hereto as **Exhibit 2**, at ¶¶

9   2–4; Declaration of Joshua H. Watson ("Watson Fee Dec."), attached hereto as **Exhibit 3**, at ¶¶ 2–

10  4. Class Counsel were equal to the difficult and novel tasks at hand. They were also equal to the

11  experience and skill of the lawyers representing Google. The subject matter is highly technical,

12  including facts about Google's cybersecurity and industry best practices, requiring use of

13  experienced experts.

14      Fundamentally, the issues here were unique in data breach cases in light of the manner in

15  which the Data Leaks occurred, the third parties with whom information was potentially shared,

16  and the nature of the information in Class Members' Google+ Profile accounts. Generally, data

17  breach cases involve the pilfering of known, uniform types of data—often set fields of payment

18  card related data, personal health information, or personal information like the combination of

19  names, dates, and Social Security numbers. Here, however, the types of especially sensitive

20  information at issue for any particular Class Member varied based on the contents of their Google+

21  accounts. This necessarily involved a highly technical understanding of the subject matter,

22  including working with cybersecurity and economics experts to determine the value of information

23  not exfiltrated, but instead possibly shared with third-party vendors Google had already vetted for

24  dissemination, should a user have specified that intent.

25      Additionally, Class Counsel initiated this lawsuit when Google announced the First Data

26  Leak—which, based on available information, may have impacted hundreds of thousands of

27  Google+ users (of which U.S.-based users would account for a substantially-lower amount)—far

28  fewer than other blockbuster and headline-grabbing data breaches announced over the last few

1    years. (Dkt. No. 1). When that number drastically increased the number of potentially impacted

2    Google+ users from hundreds of thousands of users to tens of millions of users worldwide, Class

3    Counsel were quick to amend and continue to represent the best interests of the class. The Court

4    then appointed Class Counsel during the interim of litigation, charged with responsibilities to

5    orderly and efficiently conduct litigation, such as discovery, expert retention, and settlement

6    discussions, while avoiding unnecessary duplication and unproductive efforts. (Dkt. No. 44). Class

7    Counsel, particularly John Yanchunis, has substantial experience litigating complex class cases of

8    various natures, and extensive exposure to the highest profile data breach cases in the country. For

9    example, Mr. Yanchunis served as lead counsel in the *Yahoo!* data breach case and was a member

10   of the Plaintiffs Steering Committee who assisted his counsel in negotiating the settlement in

11   *Equifax*, the largest settlement of a data breach case to date. Yanchunis Prelim. App. Dec. ¶ 19.

12   Having worked on behalf of the putative class since the Data Leaks were first announced, evaluated

13   the legal and factual disputes, and dedicated considerable time and monetary resources to this

14   litigation, Class Counsel endorse the Settlement without reservation. Yanchunis Prelim. App. Dec.

15   ¶¶ 19–22, 28, 37.

16           **4.    Awards in Similar Cases**

17           The requested fee percentage of 25% is reasonable when compared to reported data breach

18   class action fee orders in the Northern District of California in the last 10 years, set forth in **Exhibit**

19   **4** attached. The requested fee percentage of 25% (and attendant lodestar multiplier of 1.85) is

20   reasonable when compared to reported class action fee orders with common funds of $5 million

21   or more in the Northern District of California in the last 10 years, which includes the data breach

22   fee orders, **Exhibit 5**.

23       **B.    The Request is Reasonable Under the Lodestar Cross-Check**

24           "Generally, a district court is 'not required' to conduct a lodestar cross-check to assess the

25   reasonableness of a fee award." *Perez v. Rash Curtis & Associates*, 2020 WL 1904533, at *18

26   (N.D. Cal. April 17, 2020) (citing *In re Google Referrer Header Privacy Litig.*, 869 F.3d 737, 738

27   (9th Cir. 2017) and collecting cases in the Ninth Circuit). Importantly, where counsel, as here,

28   estimates the need for "future hours to be spent in reaching an ultimate resolution in this matter

including the expectation that the litigation is expected to continue for several years through appeal," those future, anticipated hours are appropriately considered in a lodestar analysis. *Perez*, 2020 WL 1904533 at *20. "In evaluating whether a lodestar multiplier is appropriate, district courts in the Ninth Circuit analyze a number of factors, including, but not limited to: (i) the quality of the representation; (ii) the benefit obtained for the class; (iii) the complexity and novelty of the issues presented; and (iv) the risk of nonpayment. Foremost among these considerations, however, is the benefit obtained for the class." *Id.* at 21 (citations and marks omitted). These factors weigh heavily in favor of Class Counsel's fee request and multiplier.

### 1.     The Benefits Achieved are Exceptional

Class Members are eligible to recover monetary benefits from Google for the Data Leaks, despite this case not involving traditional exfiltration by nefarious actors. Plaintiffs' and Class Members' personal information was potentially disseminated to third-party vendors Google had already vetted. Therefore, this litigation does not involve exfiltration and potential misuse of the information by nefarious actors, but rather potential dissemination to Google-vetted third-party vendors. As noted, *supra*, the information at issue has an average value of $2.50 as calculated by Class Counsel's respected expert,[4] and as of filing this Motion, the reaction from Class Members is enthusiastic, exceeding approximately 1.5 million claims. After accounting for all costs (notice and claims administration, as well as litigation costs), service awards, and a reasonable fee award, Class Members are likely to recover an amount exceeding the $2.50 average calculated by Mr. Ratner; if the Court were to grant Plaintiffs' Motion in full, the per-claimant settlement value would surpass $3.00.

### 2.     Class Counsel Provided Outstanding Representation in an Area of Law with Complex and Novel Issues

Class Counsel are skilled and experienced in this area of law, and this Court recognized these skills and experience in its interim appointment of class counsel. (Dkt. No. 44) (finding good

---

[4] The foundation of Mr. Ratner's damages model faced a *Daubert* challenge in *Adkins v. Facebook*, and the Honorable Judge William Alsup denied in full that *Daubert* challenge. *Adkins*, No. 3:18-cv-5982, Dkt. No. 260.

1    cause for appointment based on the applications to the Court). In addition to the vast experience

2    outlined in the Joint Motion for Appointment of Interim Lead Counsel, (Dkt. No. 27), Mr.

3    Yanchunis has since achieved even more considerable accolades: he successfully settled *Yahoo!*

4    on behalf of 194 million consumers securing $117.5 million in class benefits, 2020 WL 4212811;

5    served as co-lead counsel in the 2018 data breach litigation against Facebook, achieving a

6    contested injunctive class with pending preliminary approval, *Adkins*, 2019 WL 7212315, *9; he

7    currently serves as co-lead counsel in the Capital One MDL, *In re Capital One Consumer Data*

8    *Sec. Breach Litig.*, --- F. Supp. 3d ---, 2020 WL 5629790 (E.D. Va. Sept. 18, 2020). Mr.

9    Yanchunis' updated experienced is attached. Yanchunis Fee Decl., ¶¶ 2–3, Ex. A. Drawing on this

10   experience, Class Counsel worked with industry experts and prosecuted this case vigorously yet

11   efficiently, and achieved exceptional results for the Class.

12              **3.    The Risk of Nonpayment was Substantial and Supports the**
                         **Requested Award of Attorneys' Fees**
13

14          Class Counsel took this case on a pure contingency basis without any form of litigation

15   funding or outside funding; the litigation was entirely self-funded for the benefit of the Class.

16   Yanchunis Fee Decl., ¶¶ 8–9. Without any guarantee that they would receive any form of

17   compensation for the substantial work undertaken, Class Counsel expended 990.7 hours litigating

18   the Class' claims at a value of $687,980.60, and incurred $64,603.23 in reasonable out-of-pocket

19   costs during the pendency of this case. Yanchunis Fee Decl., ¶¶ 8–9; Azar Fee Decl., ¶¶ 5–6;

20   Watson Fee Decl., ¶¶ 9–10. California courts and the Ninth Circuit recognize incentivizing

21   contingency-based litigation through upward fee adjustments to ensure that the fees account for

22   contingency risk. *See, e.g.*, *Ketchum v. Moses*, 24 Cal. 4th  1122, 1133 (2001) (recognizing the

23   risk of contingency-based litigation and awarding a multiplier sufficient to account for same); *In*

24   *re Washington Pub. Power Supply*, 19 F.3d 1291, 1300–01 (9th Cir. 1994) (holding that

25   "Contingent fees that may far exceed the market value of the services if rendered on a non-

26   contingent basis are accepted in the legal profession as a legitimate way of assuring competent

27   representation for plaintiffs who could not afford to pay on an hourly basis regardless whether they

28   win or lose). Risk should be compensated with a commensurate reward, and Class Counsel

1    endeavored and secured compensation and value with many risks in a relatively unsettled area of

2    law, thus justifying the requested fee.

3          Few contested classes have been certified in consumer data breach class actions. *See, e.g.*,

4    *Smith¸* 2017 WL 1044692, at *6 (hospital data breach with contested Rule 23(b)(3) damages class

5    certified at the trial court level); *see also Adkins*, 2019 WL 7212315 at *9 (social media data breach

6    with contested Rule 23(b)(2) injunction class certified at the trial court level). Minding these

7    factors and other potential hurdles, there can be no question that the risk of nonpayment was

8    substantial. In its motion to dismiss, Defendant highlighted cases from this District and abroad

9    calling into question a litigant's Article III standing, as well as alleged legal deficiencies in

10   Plaintiffs' case. (Dkt. No. 45, at 7–14, 15–16, 17–21). As noted, *supra*, the issues presented in this

11   case have still-developing case law and ample uncertainty. While Plaintiffs may have succeeded

12   at the trial court level in defeating a motion to dismiss, defeating a motion for summary judgment,

13   and certifying a damages-based class, the passage of time and delay in delivering benefits to Class

14   Members would have been protracted, and any appellate processes would have further prolonged

15   the delivery of those benefits. No stage of the proceedings is guaranteed, and with the highlighted

16   hurdles of overcoming the motion to dismiss and achieving contested certification in this case, it

17   is plainly clear that Class Members may not have recovered any monetary benefits and Google's

18   social media platform may have continued to exist without this litigation. Instead, Class Members

19   will receive compensation.

20         As the Court ruled during the preliminary approval hearing, this Settlement fairly and

21   adequately compensates Class Members. Given all of the hurdles faced, Class Counsel achieved a

22   monetary benefit for Class Members, likely to exceed even the average value Class Counsel's

23   expert pinned on the value of the information disclosed in the Data Leaks.

24         **4.      The Remaining Factors Support the Cross-Check**

25         Where the use of lodestar method is used as a cross-check, it can be performed with a less

26   exhaustive review and analysis of hours. *See In re Rite Aid Corp. Secs. Litig.*, 396 F.3d 294, 306

27   (3d Cir. 2005) ("The lodestar cross-check calculation need entail neither mathematical precision

28   nor bean-counting"); *In re Immune Response Sec. Litig.*, 497 F. Supp. 2d 1166, 1176 (S.D. Cal.

2007) ("Although counsel have not provided a detailed catalogue of hours spent, the Court finds the information provided to be sufficient for purposes of lodestar cross-check.").

In considering hourly rates for time spent on litigation, courts examine the rate "prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984). Here, the hourly rates for Class Counsel are not only comparable to similar services by lawyers of reasonably comparable skill, experience, and reputation—Class Counsel have been approved at the billing rates they seek in this case. *See, e.g.*, *In re Yahoo!*, 2020 WL 4212811, *26 (approving rates for paralegals and attorneys ranging between $190 and $975 per hour); *In re Equifax*, 2020 WL 256132, *39 (finding as reasonable attorneys rates ranging up to $935 per hour); *Fulton-Green v. Accolade, Inc.*, 2019 WL 4677954, * 12 (E.D. Pa. Sept. 24, 2019) (same; $202 and $975 per hour). These rates are also reasonable for this community. *In re Yahoo!*, 2020 WL 4212811, *26.

The hours expended are also reasonable. In considering the reasonable of hours, "[b]y and large, the court should defer to the winning lawyer's professional judgment as to how much time he was required to spend on the case; after all, he won, and might not have, had he been more of a slacker." *Moreno v. City of Sacramento*, 534 F.3d 1106, 1112 (9th Cir. 2008). To date, Class Counsel have expended 990.7 hours litigating this matter to the benefit of the Class. Yanchunis Fee Decl., ¶ 8; Azar Fee Decl., ¶ 5; Watson Fee Decl., ¶ 9. This time included investigating this case; bringing this case when the announcement of the First Data Leak comprised approximately 500,000 consumers; attentively tracking news and announcements, including the announcement of the Second Data Leak increasing the number of potential class members to over 53 million; amending complaints; consolidating the cases before this Court; defending against a motion to dismiss; conducting informal discovery; preparing for and attending mediation; obtaining post-mediation information; negotiating a complex Settlement Agreement; soliciting bids for and investigating potential notice and claims administrators and their respective plans; moving for and successfully obtaining preliminary approval; working in concert with the Settlement Administrator; preparing the Press Release; monitoring the Notice Program and claims

1    administration; and this Motion. Yanchunis Fee Decl., ¶ 6; Azar Fee Decl., ¶ 4; Watson Fee Decl.,

2    ¶ 7.

3         And Class Counsel's responsibility for this case is far from over. Class Counsel necessarily

4    must continue to work with the Settlement Administrator, review and respond to objections, move

5    for final approval, handle appeals, and oversee the final administration of benefits to Class

6    Members. These hours are anticipated to eclipse 500 hours, for an additional lodestar of

7    $325,000.00, Yanchunis Fee Decl., ¶ 9, bringing Class Counsel's anticipated lodestar to

8    approximately $1,012,980.60. Based on this additional lodestar, Class Counsel's lodestar

9    multiplier would reduce from approximately 2.73 to 1.85. Given the foregoing, Class Counsel's

10   fee request of $1,875,000.00 is reasonable.

11       **C.    The Requested Expenses are Reasonable**

12       In common-fund cases, the Ninth Circuit has stated that the reasonable expenses of

13   acquiring the fund can be reimbursed to counsel who has incurred the expense. *See Vincent v.*

14   *Hughes Air W., Inc.*, 557 F.2d 759, 769 (9th Cir. 1977); *Acosta v. Frito-Lay, Inc.*, No. 15-CV-

15   02128-JSC, 2018 WL 646691, at *11 (N.D. Cal. Jan. 31, 2018) ("There is no doubt that an attorney

16   who has created a common fund for the benefit of the class is entitled to reimbursement of

17   reasonable litigation expenses from that fund.") (citation omitted). Such expense awards comport

18   with the notion that the district court may "spread the costs of the litigation among the recipients

19   of the common benefit." *Wininger v. SI Mgmt. L.P.*, 301 F.3d 1115, 1121 (9th Cir. 2002).

20       Here, Class Counsel request $69,603.23 in litigation costs and expenses reasonably

21   incurred. Class Counsel provide a breakdown of the unreimbursed expenses necessarily incurred

22   by counsel in this case. Yanchunis Fee Decl., ¶ 9; Azar Fee Decl., ¶ 6; Watson Fee Decl., ¶ 10. As

23   with the lodestar, all expenses were carefully scrutinized. *Id.* These expenses are in line with those

24   approved by courts in this District. *In re Anthem*, 2018 WL 3960068, at *28; *In re High-Tech*

25   *Employee Antitrust Litig.*, 2015 WL 5158730, at *16 (N.D. Cal. Sept. 2, 2015). The request for

26   award of litigation costs and expenses is reasonably, particularly in light of its actual amount

27   compared with the permissible amount contemplated in the Settlement Agreement. SA § 9.1.

28

1    **D.      Service Award Request Is Reasonable**

2         Finally, Plaintiffs seek modest Service Awards of $1,500 for each of the four Plaintiffs as

3    appointed representatives of the Class. Each of the four named Plaintiffs in this case have been

4    integral in litigating this matter, including providing the entirety of their Google+ profiles to

5    Google during informal discovery exchanged prior to the mediation in this case. All four

6    representatives have been personally involved in the case and support the Settlement. Plaintiffs

7    devoted substantial time and effort to this matter. The amounts requested here comport with the

8    Ninth Circuit's benchmark and this Court's prior rulings. *See In re Online DVD-Rental Antitrust*

9    *Litig.*, 779 F.3d 934, 947 (9th Cir. 2015) (finding $5,000 reasonable); *In re Anthem*, 2018 WL

10   3960068, at *31 (awarding $5,000 for plaintiffs who, among other things, responded to discovery

11   requests and were deposed, and awarding $7,500 for plaintiffs who, in addition, had their devices

12   imaged); *In re Yahoo Mail Litig.*, 2016 WL 4474612, at *11 (N.D. Cal. Aug. 25, 2016) (awarding

13   $5,000.00).

14   **III.     CONCLUSION**

15        Plaintiffs respectfully request the Court enter an order awarding Plaintiffs, as

16   representatives of the class, service awards in the amount of $1,500.00 each; awarding Class

17   Counsel their requested attorneys' fees of $1,875,000.00, which includes both the attorneys' fees

18   incurred to date and those anticipated future attorneys' fees, amounting to 25% of the Settlement

19   Fund, reflecting a 1.85 multiplier of Class Counsel's current and anticipated lodestar; and awarding

20   Class Counsel their requested litigation costs of $69,603.23, which includes both the litigation

21   costs incurred to date and those anticipated litigation costs.

22   Dated: September 28, 2020                    /s/ *John A. Yanchunis*

23                                                JOHN A. YANCHUNIS (*pro hac vice*)
                                                  jyanchunis@forthepeople.com
24                                                RYAN J. McGEE (*pro hac vice*)
                                                  rmcgee@forthepeople.com
25                                                **MORGAN & MORGAN**
                                                  **COMPLEX LITIGATION GROUP**
26                                                201 N. Franklin Street, 7th Floor
                                                  Tampa, Florida 33602
27                                                Telephone:     (813) 223-5505
                                                  Facsimile:     (813) 223-5402
28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Clayeo C. Arnold, SBN 65070
carnold@justice4you.com
Joshua H. Watson, SBN 238058
jwatson@justice4you.com
**CLAYEO C. ARNOLD**
**A PROFESSIONAL LAW**
**CORPORATION**
865 Howe Avenue
Sacramento, California 95825
Telephone:    (916) 777-7777
Facsimile:    (916) 924-1829

FRANKLIN D. AZAR (*pro hac vice*)
azarf@fdazar.com
MARGEAUX R. AZAR (*pro hac vice*)
azarm@fdazar.com
**FRANKLIN D. AZAR & ASSOCIATES,**
**P.C.**
14426 East Evans Avenue
Aurora, Colorado 80014
Telephone:     (303) 757-3300
Facsimile:     (720) 213-5131

*Appointed Class Counsel*

1

**<u>CERTIFICATE OF SERVICE</u>**

2

      I hereby certify that on September 28, 2020, I authorized the electronic filing of the

3

foregoing with the Clerk of the Court using the CM/ECF system which will send notification of

4

such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List.

5

      I certify under penalty of perjury under the laws of the United States of America that the

6

foregoing is true and correct.

7

      Executed on September 28, 2020.

8

                                */s/ John A. Yanchunis*

                                John A. Yanchunis

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28